# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KAREN J. GROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3225 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Karen J. Gross, a/k/a Karen Middleton, appeals from the denial of her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Gross filed a Motion for Summary Judgment (d/e 14). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17). The parties have consented to proceed before this Court. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered September 19, 2018 (de/ 8)</u>. For the reasons set forth below, the Decision of the Commissioner is REVERSED and REMANDED for further proceedings under 42 U.S.C. § 405(g) sentence four.

## STATEMENT OF FACTS

Gross was born on August 1, 1965. She attended special education classes in school. She completed the eighth grade.[1] She has no prior relevant work experience. She applied for SSI on September 10, 2014. She suffers from the severe impairments of lumbar disc degeneration and facet arthropathy at L4-5 and L5-S1; degenerative changes of the cervical spine status post fusion of the C5-6 and C6-7 vertebrae, chronic obstructive pulmonary disease (COPD), obesity, generalized anxiety disorder, and low intelligence. Gross previously applied for SSI in 2008. In 2011, the Commissioner's Appeals Council refused to review the denial of her 2008 application. Certified Transcript of Proceedings before the Social Security Administration (d/e 11 and 12) (R.), at 17, 29, 47, 50, 101, 113, 980,1463.

On May 29, 2008, state agency psychologist Dr. Delores Trello, Psy.D., conducted a mental status examination of Gross as part of Gross' 2008 application for SSI. R. 374-79. Dr. Trello conducted the examination primarily to determine if Gross was able to handle money in her own best interest. Gross lived with her boyfriend at the time. She had been married

---

[1] Gross has stated on one occasion that she quit school in the eighth grade and on another occasion stated that she completed the eighth grade. R. 50, 980, 1463.

three times. Her last husband died of a heart attack.  Gross said she

applied for SSI because of her medical issues with tendonitis in both

hands.  Gross said she quit school in the eighth grade.  She reported that

she was dependent on alcohol, but said she quit drinking a year earlier.  R.

374-76.  During her mental status exam, Gross spoke coherently and had a

normal affect, her memory was intact, she was adequately informed, she

had difficulty with simple calculations, she attempted to provide abstract

meanings to simple proverbs, and she provided solutions to hypothetical

situations.  Dr. Trello assessed alcohol dependence with no alcohol for one

year, generalized anxiety disorder, and personality disorder not otherwise

specified.  R. 377.

Dr. Trello gave Gross a Global Assessment of Functioning (GAF)

score of 50. R. 377.  The GAF score was a measure of a clinician's

judgment of an individual's overall level of functioning on a hypothetical

continuum of mental health and illness.  American Psychiatric Assn,

Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.)

(DSM IV-TR), at 32-35.  A GAF score of 41 to 50 indicated either serious

symptoms or a serious impairment in social, occupational, or school

functioning.  DSM IV-TR, at 34.  The American Psychiatric Association no

longer recommends use of the GAF score.  <u>Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013)</u>, at 16.

Dr. Trello concluded, in part:

> Mrs. Gross seems able to handle funds in her own best interest except she did have trouble with arithmetic.  She has used no alcohol for one year.  Her understanding and memory seemed fair.  Her sustained concentration and persistence, social interaction and adaptation seemed impaired.

R. 378.

On April 24, 2014, Gross saw her primary care physician Dr. Roger McClintock, M.D., for swelling in her neck.  R. 437-38.  On examination, her neck was supple and her extremities were unremarkable.  Dr. McClintock ordered several tests, including an ultrasound of her neck and a chest x-ray.  R. 438.

On June 11, 2014, Gross saw Dr. McClintock for a follow up examination of a cough.  R. 435-36.  On examination, her neck was supple and her extremities were unremarkable.  R. 436.

On June 22, 2014, Gross was in a one-vehicle automobile accident.  R. 386-404, 410-12.  Gross left the scene of the accident, but then returned.  She was taken to Taylorville Memorial Hospital in Taylorville, Illinois (Taylorville Memorial).  She reported chest pain, abdominal pain, abdominal bruising, and a headache.  She was taken to the Southern

Illinois Trauma Center at Memorial Medical Center in Springfield, Illinois (Springfield Memorial).  She suffered injuries when she apparently drove off the road into a culvert.  R. 386, 389.  The transporter notes indicated that Gross was intoxicated.  R. 388.  Subsequent medical tests showed a blood ethanol level of 0.148.  R. 412. Gross' examination at the trauma center reported minimal tenderness in her neck, good movement and normal muscle strength in her extremities, and intact sensation.  She had good movement of her upper extremities.  Her lower extremities were immobilized on a back board during the examination.  She had some bruising and her back was not tender.   R. 391-92, 412.  Gross had a CT scan done of her head, cervical spine, thoracic spine, lumbar spine, chest, abdomen, and pelvis.  The results were normal except for mild degenerative changes in her thoracic and lumbar spine.  R. 398-403.

On July 16, 2014, Gross saw Dr. McClintock to talk about her medication.  Gross reported having some neck pain.  Gross said she was having weakness in her arms and she dropped things occasionally.  She asked for stronger pain medication.  She reported no other problems.  On examination, her neck was supple and her extremities were unremarkable.  Dr. McClintock observed no focal deficits on examination.  Gross had some pain on palpation of her left scapular area.  Her grip strength was "pretty

good." Dr. McClintock saw no evidence of radicular pain. Dr. McClinton ordered a nerve conduction study of Gross' upper extremities. R. 434.

On August 20, 2014, Gross saw Dr. Fortin who administered trigger point injections in her trapezii bilaterally. R. 510.

On September 15, 2014, Gross saw nurse practitioner Chris Carver for a follow up on Gross' neck and back pain. Gross reported numbness in her left arm, numbness and tingling in her right leg, and toe cramping in her right foot. She said her pain was 7 out of 10. Gross reported her pain was about the same. She said that the trigger point injections were not helpful. Carver ordered x-rays of her cervical and lumbar spine. R. 503. The cervical spine x-rays showed narrowing of the C5-C6 interspace, but no fracture, displacement or destruction. R. 547. Her lumbar spine results were normal except for minor degenerative changes in the lower thoracic spine. Carver noted that the degeneration at C5-C6 was present on past x-rays. R. 546. Carver's examination showed adequate concentration and attention span, normal shoulder shrug, normal muscle bulk and tone, normal strength in upper and lower extremities, pinprick sensation reported as dull in lower extremities, and her gait was steady. R. 506, 547.

On October 15, 2014, Dr. Claude Fortin, M.D., conducted an EMG nerve conduction study. The study was unremarkable in both legs and

lumbar paraspinal muscles. Dr. Fortin found no evidence of lumbar radiculopathy, lumbosacral plexopathy or polyneuropathy. R. 541.

On October 17, 2014, Gross saw Dr. McClintock due to neck pain. Gross had some swelling on the right side of her neck consistent with a muscle strain. Gross asked for a letter "for housing." Dr. McClintock stated he could explain her problems and her treatment history, but he "could not do a disability determination." R. 498. On examination, Gross' extremities were unremarkable, and no focal deficits were observed. Gross had tension in her neck consistent with a muscle strain. Dr. McClintock diagnosed a muscle strain and prescribed medication. R. 499.

On December 4, 2014, Gross' mother Eileen Everlen completed a Social Security Administration form entitled Function Report—Adult—Third Party. R. 293-300. Everlen said she spent 24 hours a day with Gross sitting, talking watching television, and shopping. Everlen said Gross had rib pain, pain when she bent over, and pain when she lifted objects. She said Gross "just lays around in pain." She said Gross had trouble sleeping due to pain in her ribs and back. Everlen said Gross watched television, played games on the computer, and took naps. R. 293-94, 297.

On December 2, 2014, Gross prepared a Social Security Administration form entitled Function Report – Adult. R. 278-85. Gross

reported that she spent her day watching television, playing games on her computer, and taking naps. She said she was "up and down all throughout the night" due to her back and rib pain. She said she had no trouble handling her personal care. Gross said she needed help remembering to take her medications and to make her appointments. She reported that she prepared daily meals consisting of frozen dinners and sandwiches. She took about five minutes to prepare a frozen dinner or make a sandwich. She said that she did no household chores and no yardwork due to her pain. She said she went out weekly. She drove and went out alone. She went shopping for two hours once a week. She talked to others daily over the phone or computer. R. 278-82.

Gross reported that her impairments affected her ability to lift, bend, stand, reach, sit, concentrate, understand, and follow instructions. Gross opined that she could not lift more than two pounds, and she could walk half a block before she had to stop and rest for 10 minutes. She could not follow written instructions very well. She could follow spoken instructions "very will sometime's my mind wonders off." R. 283. She said she got along well with authority figures. She said she had "a lot of anxiety and in lots of pain." R. 284. Her medication made her drowsy. R. 285.

Everlen said Gross had no trouble taking care of her personal needs. She said Gross needed to be reminded to go to appointments and to take medications. Gross prepared frozen dinners and sandwiches on a daily basis, and took about five minutes preparing these meals. She said that Gross did not do any household chores or yardwork. She said Gross went outside weekly. Gross drove a car. Gross shopped once a week for two hours. Gross was not good with math and not good at handling money. Everlen said Gross talked on the phone or the computer daily. Gross did not go anywhere on a regular basis. R. 296-97.

Everlen said that Gross' pain affected her ability to lift, bend, stand, reach, and sit. Gross' pain also affected her memory, concentration, understanding, and her ability to follow instructions. Everlen opined that Gross could only lift two pounds, walk half a block, and pay attention for five to ten minutes. Everlen said Gross did not finish what she starts, and Gross got along with authority figures. R. 298-99. Everlen said Gross had anxiety and fear of dying and "cries a lot form the pain and lack of socialization." R. 299.

On January 28, 2015, state agency physician Dr. Vittal Chapa, M.D., conducted a consultative examination. R. 974-76. Gross reported that she had tendonitis in both wrists. She said she had rib fractures from the

automobile accident.  She could not sit for long periods of time.  She had a tingling sensation in her feet.  On examination, she was 65 ¼ inches tall and weighed 207 pounds.  Her gait was normal.  She showed no motor weakness or muscle atrophy.  She could appreciate pin prick sensation in her extremities.  Her reflexes were symmetric.  She had no joint redness or heat.  Her grip strength was normal.  She could perform fine and gross manipulations bilaterally.  She complained of rib pain on flexion of her spine at 40 degrees.  Straight leg testing was normal.  She had full range of motion in all joints.  Dr. Chapa assessed history of COPD and musculoskeletal pain due to car accident.  R. 976.

On the same day, January 28, 2015, state agency psychologist Dr. Trello conducted another mental status examination of Gross. R. 980-85. Dr. Trello conducted the examination to determine whether Gross was capable of handling her own funds in her own best interest.  R. 980.  Gross said she had a learning disability.  She said she was in special education classes in school and quit school in the eighth grade.  Gross lived with her mother after her boyfriend kicked her out of his home.  She said she liked to be on the computer.  She said she did her own self-care.  She used a microwave to prepare food.  Her mother had a housekeeper that did the housework.  She went shopping with her mother.  Her mother paid the bills.

Gross said she could drive.  R. 980-82.   Gross told Dr. Trello that she started drinking when she was 13.  She stopped in 2008 but resumed in 2009.  At the time of the examination, she said she drank a six-pack of beer every day.  She said she stopped using illegal drugs in 1982.  She said she smoked one to two packs of cigarettes a day.  R. 982.

On examination, Gross' memory was intact.  She was adequately informed.  She had difficulties with simple calculations.  She provided abstract meanings to simple proverbs.  She attempted to solve hypothetical problems.  Dr. Trello assessed alcohol dependence, generalized anxiety disorder, and dysthymic disorder.  Dr. Trello concluded that Gross "did well enough on her mental status examination.  However, it would be better if she had a payee given her alcohol dependence."  R. 984.

On February 11, 2015, state agency psychologist Dr. Russell Taylor, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 124-26, 129-31.  Dr. Taylor opined that Gross was moderately restricted in activities of daily living and had moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace.  Dr. Taylor found no evidence of any decompensation of extended duration.  R. 125.  Dr. Taylor opined that Gross retained the mental capacity to understand, remember, and

concentrate sufficiently to carry out simple instructions for a normal work period. He opined that Gross could make simple work-related decisions and could interact and communicate with others sufficiently in a work setting with reduced social demands. He said that she could not work with the public. Dr. Taylor opined that Gross could adapt to simple, routine changes and pressures in the work environment. R. 131.

On February 12, 2015, Gross went to the emergency room at Taylorville Memorial. Gross reported that she fell as she was picking up her mother who had fallen. Gross reported pain in her right-side ribs and shoulder. She rated the pain as 8 out of 10. She also complained of neck pain. On examination, Gross had pain on palpation along the right-side rib cage. Gross had full range of motion in her extremities. Her sensation was intact. The emergency room physician diagnosed a muscle strain and prescribed Naprosyn pain reliever and Flexeril muscle relaxer. R. 988-89, 1197-98.

On February 16, 2015, Gross saw nurse practitioner Chris Carver for numbness and tingling in her arms and for neck pain. She said her pain was the same as the last time she was seen. She rated her pain at 6 out of 10. She said the numbness and tingling in her arms worsened since December 2014. She said she also has had low back pain since an

accident when she tried to lift something for her mother. R. 969. On examination, Gross' memory was intact and her attention and concentration were adequate. Gross' shoulder shrug was normal, her muscle bulk and tone were normal, her strength was 4/5 in all extremities, and her gait was steady. Carver ordered an EMG/nerve conduction study of her upper extremities and an MRI of her cervical spine. R. 971.

On February 24, 2015, Gross saw nurse practitioner Patricia Schneider, FNP-BC, complaining of right thumb pain. R. 998-1001. On examination, Gross had full range of motion in her neck. The neck was supple and not tender. She had adequate range of motion in her extremities. She had a knot at the base of her thumb that was painful to palpation. She could flex and extend her thumb and fingers without difficulty. Her sensation was intact. Schneider took x-rays of the thumb and prescribed anti-inflammatories.

On February 24, 2015, Gross had an MRI of her cervical spine. The MRI showed cervical spondylosis at C4-5, moderate spinal stenosis and left foraminal narrowing at C5-6, and central disc osteophyte complex at C-6-7. These findings correlated with Gross' radiculopathy symptoms. R. 986.

On March 18, 2015, Gross saw Dr. Claude Fortin, M.D., for a follow-up after an EMG study.  The EMG study demonstrated bilateral C6-7 poly radiculopathies with mild to moderate spinal stenosis and left foraminal narrowing. On examination, Gross' range of motion was reduced, and she had normal strength in her upper extremities.  Dr. Fortin assessed bilateral C6-7 poly radiculopathies and multilevel cervical spinal stenosis.  R. 1159-60.

From March 16, 2015, to April 13, 2015, Gross received physical therapy for right shoulder pain.  R. 1030-37.  At the end of the treatment, Gross showed some improvement in her range of motion in her upper extremities.  She had persistent pain in the back of her neck and tingling in her hands.  R. 1037.

On March 27, 2015, Gross saw Dr. Raj Sinha, M.D., for a consult concerning Gross' right hand.  R. 1025-27.  Gross told Dr. Sinha that the knot had been at the base of her thumb for about a month.  Dr. Sinha said that the x-ray was negative by report.  On examination, Gross had a normal gait and her neck was supple.  Dr. Sanha believed the knot was a ganglion cyst.  Gross decided to have the cyst removed.  Dr. Sanha scheduled the surgery.  R. 1026.

On April 30, 2015, Gross saw surgeon Dr. Leslie Acakpo-Satchivi, M.D., Ph.D., for evaluation for possible neck surgery.  R. 1039-43, 1088-92, 1154-58.  Gross reported that her pain has been worse since the June 2014 motor vehicle accident.  She said that her pain was 5 out of 10.  She said the pain radiated down into her hands and she regularly dropped things.  Gross said that she has tried physical therapy, bed rest, steroids by mouth, pain medication, and muscle relaxants.  Nothing has worked.  R. 1039, 1088, 1154.  Dr. Acakpo-Satchivi stated that the February 24, 2015 MRI which showed bilateral C6/C7 radiculopathy and March 18, 2015 EMG study results were consistent with that finding.  On examination, Gross had normal gait, normal strength, and intact sensation.  Dr. Acakpo-Satchivi assessed cervical spondylosis.  Dr. Acakpo-Satchivi stated that Gross was an ideal candidate for a C5-C6 and C6-C7 discectomy.  Gross agreed.  R. 1041-42, 1091-92, 1157-58.

On May 4, 2013, Gross saw Dr. McClintock for a preoperative evaluation before her neck surgery.  She had no other problems.  R. 1086.  On examination, her neck was supple, her extremities were unremarkable, and no focal deficits were seen.  R. 1087.

On May 13, 2015, Dr. Acakpo-Satchivi performed cervical discectomy and fusion at C5-6 and C6-7 in Gross' cervical spine.  R. 1060-63.

On May 26, 2015, Gross saw nurse practitioner Stephanie Solomon, N.P., for a post-op visit. The incision showed no signs of infection. Gross complained of difficulty swallowing. Gross reported that she still dropped things, she had hand spasms, and she had pain across her shoulders. Solomon stated that Gross' radicular pain was resolved. Her medication helped with the pain. She denied any new weakness, numbness, or tingling. On examination her strength and gait were normal. Her incision was normal. Her cervical range of motion was slightly limited. Solomon stated that Gross could resume activities of daily living without lifting greater than 20 pounds after her surgery. R. 1081.

On June 3, 2015, state agency physician Dr. Victoria Dow, M.D., prepared a Physical Residual Functional Capacity Assessment of Gross. R. 127-29. Dr. Dow opined that Gross could occasionally lift 20 pounds and frequently lift 10 pounds in an eight-hour workday; could stand and/or walk six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and could occasionally balance; and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. R. 126-28.

On July 14, 2015, Gross' friend Melissa Hall completed a Function Report—Adult—Third Party form. R. 323-30. Hall said she had known Gross for 13 years and visited with Gross daily. She said Gross was living with a friend. Hall said that Gross was in constant pain. She said Gross could not lift anything without hurting her neck and back. R. 323. She said Gross "just lays around on the couch." She said Gross had problems sleeping because of the pain. R. 324. Hall said Gross needed help remembering her doctors' appointments and taking her medications. Hall said Gross did not prepare meals, do housework, or do yardwork. Gross did not want to do anything because she was "depressed and hurting all the time." R. 325.

Hall said that Gross drove to the grocery store once a week for about an hour. R. 326. She said that Gross could not take care of money because she could not concentrate for very long due to her pain. Hall said that Gross went to see Gross' mother weekly. R. 327. Hall opined that Gross' condition limited her ability to lift, bend, stand, walk, sit, climb stairs, complete tasks, concentrate, understand, follow instructions, and use her hands. Hall opined that Gross could walk for 15 minutes and pay attention for five minutes. R. 328. Hall said Gross got along with authority figures. She said Gross did not handle changes in routine or stress well. R. 328-

29. Hall said that Gross stayed in bed due to her pain. She said Gross could not lift a gallon of milk, and had numbness in her hands, legs, and feet. Gross' feet and legs went numb when Gross sat for long periods. R. 330.

On July 20, 2015, Gross completed another Function Report – Adult form. R. 339-46. Gross stated that she lived with friends. Gross said she was depressed and in a great deal of pain. She kept dropping things. She said she took "a lot of pain meds." She said, "Spasms in nerves, I am jumpy & shaky." R. 339. She could take care of her personal care except for fixing her hair. She needed reminders to take care of her personal needs and to take her medication. She prepared meals daily and meal preparation took five minutes. She also said that she did not cook. She dropped things and could not lift a gallon of milk. She went outside every day, and drove a car to the grocery store once a week. She could not handle money and pay bills because she did not have any income and could not count well. She was unable to concentrate due to the pain. She visited with other people every day and went to her mother's house regularly. She could go places by herself. She said friends and family made her mad. She was depressed and did not want to do anything. R. 340-44.

Gross said that her pain affected her ability to lift, bend, stand, sit, and kneel.  She could walk for 20 minutes, sit for 10 minutes, and pay attention for 10 minutes.  She did not finish what she started and did not follow written or oral instructions well.  R. 344. She got along with authority figures, but did not handle stress or changes in routine well.  R. 345.

On the same day, July 20, 2015, Gross completed a form entitled Fatigue Questionnaire and a form entitled Pain Questionnaire.  R. 332-33, 335-37.[2]  Gross reported that, in an average day, she slept.  She said she could not sustain activities due to depression and nerve pain.  Her fatigue started three years earlier.  She said she napped "every couple of hours." Gross said sometimes she drifted off during conversations and often forgot what she was doing.  R. 332-33.  Her pain began with her June 22, 2014 automobile accident.  She said that her pain was located across her shoulders, neck, and down her arms.  She said that she hurt all the time. Hydrocodone relieved her pain but made her sleepy.  R. 335.  Her daily activities consisted of sleeping.  She said that she did not do anything since she started having this pain.  R. 336.  She also said that she could drive a car and run errands such as going to the grocery store or post office

---

[2] The Fatigue Questionnaire and Pain Questionnaire do not appear to be Social Security Administration forms.  The source of the two Questionnaire forms is not in the record.

without any assistance.  She could walk less than ½ block, stand for 15 minutes, and sit for 20 minutes.  She could take care of her personal care but needed assistance to do household chores such as dusting and cooking.  R. 337.

From July 17, 2015 to August 12, 2015, Gross had physical therapy on her neck after her surgery.  R. 1213.  Gross showed small progress in her cervical spine flexion and extension, but a decline in her balance.  She reported continuing pain throughout the physical therapy.  Gross reported some improvement in her neck and back by the end of the physical therapy.  Therapy was stopped due to reports of chest pain and increases in blood pressure.  R. 1212.  The physical therapist recommended resuming physical therapy after Gross was cleared for further sessions by Dr. McClintock.  R. 1213.

On August 17, 2015, Gross saw Dr. McClintock for a medicine follow-up.  R. 1310-12.[3]  She said her antidepressant medication was working.  Gross said she wanted a refill of meclizine.  Dr. McClintock said she had no other complaints and looked better to him.  R. 1310.  On examination, her neck was supple and her extremities had no edema.  R. 1311.

---

[3] The medical records from this point listed Gross' last name as Middleton.  The parties do not explain or address the name change.  Gross remarried at some point.  R. 48.  Gross, however, continued to use the name "Gross" in all proceedings before the Social Security Administration and this Court.  The Court follows Gross' preference and uses the name "Gross" throughout this Opinion.

On November 14, 2015 state agency psychologist Dr. Ellen Rozenfeld, Psy.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 144-45, 149-51.  Dr. Rozenfeld opined that Gross was moderately restricted in activities of daily living and moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace.  R. 144.  Dr. Rozenfeld opined that Gross could make simple work-related decisions, could interact with others sufficiently in a work setting with reduced social demands, could not work with the public, and could adapt to simple routine changes and pressure in the work environment.  Gross retained the mental capacity to understand, remember, and concentrate sufficiently to carry out simple instructions / tasks for a normal work period in a work setting with routine changes.  Gross retained the ability to perform simple repetitive tasks on a sustained basis in a predictable and socially undemanding work setting with routine workplace changes.  R. 150-51.

On November 16, 2015, state agency physician Dr. Michael Delphia, M.D., prepared a Physical Functional Residual Capacity Assessment.  R. 144-49.  Dr. Delphia opined that Gross could lift 20 pounds occasionally and 10 pounds frequently; could occasionally climb ramps, stairs, ladders, ropes, and scaffold; could occasionally balance; and should avoid

concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. R. 147-48.

On November 17, 2015, Gross saw Dr. Acakpo-Satchivi for her six-month post-operative exam. R. 1308-09. Gross reported that she continued to have neck pain as well as arm pain with numbness and tingling in bilateral hands. Gross said that she had not noticed much improvement since her surgery. Gross reported popping sounds when she moved her head. On examination, Gross' strength was intact, and her gait was normal. Her cervical range of motion was normal. Gross had multiple areas of point tenderness. X-rays of the cervical spine showed good alignment and hardware placement. R. 1309, see R. 1248.

On January 27, 2016, Gross saw nurse practitioner Schneider to renew her prescriptions. She also reported neck and right shoulder pain, and a cough. R. 1304-07. She reported continuing pain in her neck and shoulder as well as intermittent dizziness. R. 1304. On examination, Gross' neck was supple but sore on the right on palpation. She had decreased range of motion in her neck. She had normal range of motion in her extremities except her right shoulder. She had soreness to palpation of the upper right shoulder. Her gait was steady, and her sensation was intact. Schneider renewed her prescriptions. R. 1307.

On February 1, 2016, Gross saw Dr. Toni Quinn, M.D., for her annual gynecological examination. On examination, Gross' neck was supple, and she had full range of motion and good muscle tone. R. 1302.

On February 16, 2016, Gross saw Dr. McClintock. Gross said she was fatigued and had tingling in her hands and feet. Gross reported increased nerve pain. R. 1295. On examination, Gross' neck was supple, and she had no significant edema in her extremities. Dr. McClintock ordered an EMG/nerve conduction study of Gross' upper and lower extremities. R. 1296-97.

On March 10, 2016, Gross saw Dr. Dawn Wietfeldt, M.D., for a consult regarding a possible screening colonoscopy. R. 1291-94. On examination, Gross had full strength in her extremities. Dr. Wietfeldt recommended performing a screening colonoscopy. R. 1294.

On March 31, 2016, Gross saw Dr. Claude Fortin, M.D., for an EMG/nerve conduction study. Gross had reported intermittent bilateral foot numbness and bilateral upper extremity pain and numbness. Dr. Fortin noted normal strength in the lower extremities. Dr. Fortin assessed mild left median neuropathy and right C-6 radiculopathy similar to the March 18, 2015 study. Dr. Fortin also found that the C7 radiculopathy noted in the March 18, 2015 study was resolved. R. 1289-90.

On May 5, 2016, Gross saw Dr. McClintock for pain in her legs and abdomen.  R. 1284-86.  Gross reported nausea and vomiting.  On examination, Gross' neck was supple, and her extremities had no significant edema.  Dr. McClintock assessed bronchitis.  R. 1285.

On May 16, 2016, Gross saw Dr. Xinyan Huang, M.D., with complaints of dysphagia.  R. 1280-83.  Gross reported frequent choking and sore throat.  On examination, Gross had a raspy voice and a deviated septum with a bony spur protrusion.  Gross' neck was supple and symmetric. Her gait was normal.  Dr. Huang recommended that Gross stop drinking soda, avoid alcohol and caffeine, and continue taking omeprazole. Dr. Huang referred Gross to a gastroenterologist for further evaluation.  R. 1282-83.

On June 21, 2016, Gross saw Dr. McClintock with left leg pain.  R. 1274-76.  She said the pain had gotten worse in the last month.  She denied any weakness.  She said the pain woke her up at night.  The pain was in her gluteal area and her left hip.  R. 1274.  On examination, her neck was supple.  She had tenderness to palpation in her left gluteal area. She had some minor discomfort on straight leg testing.  She had some pain with internal rotation of her hip.  Left hip abduction and adduction were

intact.  Dr. McClintock diagnosed left sciatic pain.  Dr. McClintock prescribed medications and ordered an x-ray of the hip.  R. 1275.

On October 31, 2016, Gross saw nurse practitioner Patricia Schneider for cough and congestion.  R. 1269-72.  She said she smoked.  She said she had been diagnosed with COPD.  R. 1269.  On examination, Gross' neck was supple and not tender.  She had full range of motion in her neck and all extremities.  Her gait was steady, and her sensation was intact.  Schneider prescribed medication for her cough and recommended that she stop smoking.  R. 1272.

On December 7, 2016, Gross saw nurse practitioner Schneider for a follow up on her sinusitis and bronchitis, and on her antidepressant medication Buspar. R. 1261-64.  She reported coughing frequently.  At times she cannot stop coughing.  She reported that she continued to smoke at this time.  R. 1261.  On examination, her neck was supple and not tender.  She had full range of motion in her neck and extremities.  Her gait was steady, and her sensation was intact.  Schneider prescribed levofloxacin and prednisone for her bronchitis and renewed her Buspar prescription.  R. 1264.

On December 23, 2016, Gross saw nurse practitioner Susan Willer, NP, at Taylorville Memorial emergency room for lower extremity pain.  R.

1186-88; see R. 1256.[4]  The pain was in her right hip radiating to her groin. She reported increased pain in her hip and groin with walking and standing. On examination, Gross' neck was normal, her right hip was moderately tender, her lower extremities had full range of motion, and she had no motor deficit or sensory deficit.  X-rays of the right hip and pelvis were negative.  R. 1187.  Dr. Munoz assessed acute nontraumatic pain.  She was discharged in good and stable condition. R. 1188.

On December 27, 2016, Gross saw nurse practitioner Schneider for a follow-up on her medications.  R. 1256-59.  On examination, Gross' neck was supple and not tender.  Gross had full range of motion in her neck. She had full range of motion in all extremities.  She had soreness to palpation in her right hip and right groin.  Schneider said that the soreness was a probable groin strain.  Gross' gait was steady, and her sensation was intact.  Schneider renewed Gross' prescriptions.  R. 1259.

On January 10, 2017, Gross saw nurse practitioner Schneider for right leg and back pain.  R. 1252-55.  On examination, Gross' neck was supple and nontender with full range of motion.  Gross had minimal LS spine soreness with pain radiating into her right leg.  Gross could sit down

---

[4] The signatures on the records also indicate that Gross saw Willer and Dr. Gabriel Munoz, M.D., reviewed Willer's notes and agreed with her findings and plan.  R. 1188.

and get up with minimal difficulty.  She had normal range of motion in all extremities.  Her gait was steady, and her sensation was intact.  Schneider assessed back pain and renewed Gross' prescriptions.  Schneider recommended avoiding straining the back while lifting.  R. 1255.

On April 17, 2017, Gross saw Dr. McClintock for a medicine refill and complaint of stomach issues.  Gross said she started vomiting a month earlier.  She reported pain in her lower rib cage. She reported numbness and tingling in her legs and pain in her groin and back.  R. 1249.  On examination, her neck was supple, and she had tenderness to palpation in her lower rib cage.  R. 1251.

On June 8, 2017, Gross had an MRI of her lumbar spine.  The results showed disc degeneration and facet arthropathy at L4-5 and L5-S1, with mild to moderate foraminal stenosis at L4-L5, and central disc protrusion at L5-S1.  The study showed no significant change since the July 31, 2015 study.  R. 1459.

On June 11, 2017, Gross saw educational psychologist Katherine S. Ancell, M.Ed., Ed.S., for a cognitive evaluation and IQ test.[5]  Gross said that she took special education classes at school and that she completed the eighth grade.  Gross reported that she lived with her husband at this

---

[5] The record does not indicate whether Ancell was a licensed psychologist.

time. She said that he took care of the household chores. She could do some household work, but her husband did a better job. She said that she helped take care of her mother. She could not read a newspaper. She mostly stayed at home but socialized some with friends. She could drive.

Ancell administered a Wechsler Adult Intelligence Scale—Fourth Edition (WAIS-IV) examination. Gross had a full-scale IQ score of 66, which was extremely low at the 1st percentile. Her working memory score was also extremely low 69, in the 2nd percentile. Ancell said the test results showed that her IQ test score fell into the extremely low range. R. 1463-65.

## THE ADMINISTRATIVE HEARING

On June 22, 2017, the Administrative Law Judge (ALJ) conducted the evidentiary hearing. R. 42-97. Gross appeared with her attorney. Vocational expert Dr. James Lanier, Ph.D., also appeared. Gross testified first. Gross testified that she was five feet six inches tall and weighed 230 pounds. She said she weighed 170 pounds in 2007. Gross lost weight after her husband died in 2005 and subsequently gained back the weight. She said her eating was out of control and she was depressed. R. 47-48.

Gross testified that she had remarried. All her children were over 18 years of age. She lived in a mobile home with her husband. The mobile home had a ramp at the entrance. No one else lived with them. She lost

her driver's license because she had a DUI conviction in November 2016. She said a friend drove her to the hearing.  R. 48-49.

Gross said she finished the eighth grade.  She got pregnant in the first week of the ninth grade and quit school.   She tried to get a GED but did not succeed.  She said she had trouble with "The writing, reading and math."  R. 50.  She had no other vocational training.  R. 51-52.

Gross said she could get the gist of a newspaper article but would not understand the words she found to be hard to understand.  She passed the written portion of the driver's license examination.  She said she could read and complete a job application form.  Gross said she could perform some addition, subtraction, and multiplication.  Division was kind of hard.  She could correctly count change.  She could read a clock to tell time.  R. 52-53.  Gross said that when she took her driver's test, she had to guess at some of the answers.  She did not understand everything on the test.  R. 88.  She last completed a job application in 1988.  R. 83.

Gross testified that she could not work because of pinched nerves in her back, neck, and tendonitis in her hands.  She said that her legs and toes went numb.  Her lower back gave her the most trouble.  She experienced agonizing, stabbing pain that went down her legs to her toes.  R. 58-60.  She had numbness in her right leg.  R. 62.  She said that after

sitting five to 10 minutes, her right leg would go numb.  Her right leg would

"catch" when she stood up.  The catching would happen whenever she

stood up.  She had pain in her leg along with the numbness.  R. 63.  Gross

said she could not do a job where she could alternate between sitting and

standing because her back and her legs would hurt too much.  Her legs

would also go numb.  When her legs go numb, she must sit or lie down.  R.

86.

Gross testified that she could walk for about 10 minutes before she

had to sit down and take a break.  She said that she held on to the

shopping cart in the store so she could catch her breath.  After 10 minutes

walking, she had to catch her breath and relax her back.  R. 63-65.

Gross said her neck did not improve after the 2015 surgery.  She

experienced pain if she turned her head.  Her neck pain went into her arms

and hands.  Her hands went numb.  She dropped things such as pencils

and drinking glasses.  R. 66-67. Gross disputed nurse practitioner

Solomon's statement on May 26, 2015, two weeks after Gross' neck

surgery, that she could resume activities of daily living without lifting greater

than 20 pounds after her surgery.  She said that her neck surgery did not

provide any relief.  R. 87.

Gross had burning pain from tendonitis in both wrists. She said that injections did not help the pain. She could only carry less than half a gallon of milk. She could not pick up half a gallon of milk. Gross said lifting that much was too painful. R. 67-68. She could sit 10 minutes. R. 69. Gross said that the numbness and tingling in her hands comes and goes and that she had the numbness and tingling a few times a week. R. 87.

Gross said her anxiety interfered with her sleep at night. She slept for three hours, stayed awake for a while, and then went back to sleep for another three hours. She took naps during the day, and fell asleep watching television. She estimated that she took five naps a day. The naps lasted from 30 minutes to two hours. R. 69-71. Her antidepressant and antianxiety medication made her sleepy. She said that her nerve pain medication gabapentin also made her sleep. R. 73-74.

Gross said she could wash dishes for about five minutes and then had to rest. Her husband did the cooking. She used a microwave oven to heat up frozen dinners and she also cooked things like hot dogs, macaroni and cheese, and frozen pizza. Gross could not stand long enough at the stove to cook. She could read and follow a recipe with help. She would usually not understand all the words in the recipe. She said she could stand up long enough to cook. R. 75-79. Gross used a recipe a few days

earlier to make macaroni and cheese.  She and her husband made meatloaf a month ago.  She got out the ingredients and he prepared the meatloaf and cooked it. R. 88.

Gross said her husband did the housework.  She used to do housework, but stopped because of, "My back and all that.  And now he won't let me do nothing."  She said he won't let her and she cannot do housework.  R. 79-80.

Gross and her husband went grocery shopping together.  She and her husband also took Gross' mother grocery shopping.  Gross said she did not do housework for her mother because her mother had a housekeeper.  Gross said her husband did the laundry.   Her husband also mowed the grass, took out the garbage, and cared for plants and flowers at their home.  R. 80-82.

Gross played games on her phone and watched television.  She said that she had many Facebook friends.  She usually fell asleep when she watched a movie on television.   If she stayed awake through the movie, she could discuss the movie with others.  She would remember the major details of the movie but would not remember everything she saw.  She said she liked mysteries and was "pretty good" at figuring out who did it.  R. 82-84.

Vocational expert Dr. Lanier then testified. The ALJ asked Dr. Lanier the following hypothetical question:

> I'd like you to consider a hypothetical individual for us though. I'd like you to consider an individual 46 to 51 years of age, who has completed eight grades of education, and who has had no past relevant work.
> This individual retains the ability to do light work, but this individual can only occasionally climb ramps and stairs. Can occasionally climb ladders, ropes and scaffolds. Can occasionally balance.
> Now, in addition, this individual can perform only simple, routine and repetitive tasks and can make only simple, work related decisions. Under these circumstances, would there be jobs that would satisfy the hypothetical?

R. 91. Dr. Lanier opined that such a person could perform the jobs of router, with 74,463 such jobs existing nationally; routing clerk, with 112,000 such jobs existing nationally and mail sorter, with 32,000 such jobs existing nationally. Dr. Lanier opined that the person could also perform sedentary jobs of addresser, with 18,829 such jobs existing nationally; document preparer, with 66,430 such jobs existing nationally; and surveillance system monitor, with 55,747 such jobs existing nationally. R. 91. All of the jobs Dr. Lanier identified could be performed with the option to sit or stand while performing them. R. 92. Dr. Lanier opined that if the person had to take two additional unscheduled breaks a day, she would not be able to keep a job. Dr. Lanier opined that the person could miss no more than 1 and ½ days a month and keep her job. R. 93. Dr. Lanier opined that no job would

allow the person to lie down during work hours other than scheduled breaks.  R. 94.  The hearing then concluded.

<u>THE DECISION OF THE ALJ</u>

On October 17, 2017, the ALJ issued his decision.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Gross met her burden at Steps 1 and 2.  Gross had not engaged in substantial gainful activity since she filed her application for SSI on September 10, 2014.  She suffered from the severe impairments of lumbar disc degeneration and facet arthropathy at L4-5 and L5-S1, degenerative changes of the cervical spine status post fusion of C5-6 and C6-7, COPD, obesity, generalized anxiety disorder, and low intelligence.  R. 17.[6]  The ALJ found that Gross' impairments or

---

[6] The ALJ stated that Gross' alcohol dependence was in remission since 2008. R. 18. Gross does not raise any issue with this finding.  The Court, however, does not understand the finding in light of evidence that at the time of the 2014 accident when she had a blood alcohol level of 0.148; she told Dr. Trello in 2015 that she drank a six-pack of beer every day; and at the evidentiary hearing she testified that she lost her license due to a DUI conviction in 2016.  On remand, the ALJ should explain his or her analysis of Gross' alcoholism more thoroughly in light of all the relevant evidence.

combination of impairments did not meet or medically equal a Listing.  R. 18-22.

At Step 4, the ALJ found that Gross had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can occasionally climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; and occasionally balance. She can perform only simple, routine and repetitive tasks, and she can make only simple work related decisions. She can only occasionally tolerate contact with co-workers, supervisors and the general public. She must have the option to sit or stand at will, with no loss in productivity.

R. 23.  The ALJ relied on the 2015 examinations by psychologist Dr. Trello and Dr. Chapa; the opinions of psychologists Drs. Taylor and Rozenfeld, and the opinions of physicians Drs. Dow and Delphia.  R. 26-27.  The ALJ also relied on imaging of her cervical and lumbar spine that showed mild to moderate impairments some of which were addressed in the May 2015 surgery on her neck.  The ALJ relied on the fact that the 2017 MRI showed no changes from the 2015 MRI.  The ALJ cited the March 2015 EMG nerve conduction studies showed cervical poly radiculopathy and noted the fact that the condition in her neck was addressed in the May 2015 surgery. The ALJ relied on numerous physical examinations that showed normal range of motion and normal gait.  The ALJ noted the January 10, 2017 examination in which Gross reported lumbar soreness and pain radiating

down her right leg.  The ALJ also noted, however, that Gross could still get up and sit down with minimal difficulty and had a steady gait.  The ALJ relied on Dr. Trello's 2015 examination that found Gross' concentration and attention span were intact and medical examinations that found her memory was intact and she had unremarkable psychiatric signs.  The ALJ acknowledged the IQ score of 66 but found that based on the other evidence on her memory and concentration, she could perform the limited tasks described in the RFC.  The ALJ also found that the medical and psychological evidence did not corroborate Gross' statements about the limiting effect of her impairments.  R. 24-26.

The ALJ also stated:

Third, the claimant has described daily activities that are not limited to the extent one would expect given the functional deficits alleged by the claimant, which is inconsistent with her statements concerning the intensity, persistence and limiting effects of her symptoms.

R. 26.  The ALJ did not discuss or cite any evidence in this portion of his decision to support the boilerplate conclusion stated above.  The ALJ stated earlier in Step 3 of his decision that Gross' memory was intact, she stated that she had never been fired because she could not get along with others, she was able to microwave food, she performed all self-care, and she shopped for groceries.  The ALJ said Gross reported to Dr. Trello in

2015 that she lived with her mother at the time, she went shopping with her

mother, and she did not do housework because her mother had a

housekeeper. The ALJ noted that Gross testified that she watched

television and used social media websites.  R. 20-22.  The Court could find

no other discussion of Gross' daily activities in the ALJ's decision.

The ALJ found that Gross' statements about the limiting effect of her

symptoms was not consistent with the medical evidence and the other

evidence in the record.  The ALJ stated:

> Based on the above, the relevant factors in this case, taken
> together, support finding the claimant's statements concerning
> the intensity, persistence and limiting effects of her symptoms
> are not entirely consistent with the medical evidence and other
> evidence in the record for the reasons explained in this
> decision.  While no single factor cited above is dispositive, the
> totality of the facts and circumstances above made it difficult for
> the undersigned to rely heavily on the claimant's subjective
> complaints to assess the claimant's residual functional capacity.
> Consequently, in determining the residual function capacity
> noted in this decision, the undersigned relied heavily on the
> available objective medical evidence of record, the qualified
> medical opinions, other opinions, and other evidence in the
> record.

R. 26.

The ALJ gave little weight to Dr. Trello's 2008 examination report and

the GAF score of 50 because the report was several years before the

relevant 2014 application date and was not consistent with the more recent

evidence in the date.

The ALJ accepted the results of Ancell's IQ testing in 2017, but gave little weight to Ancell's opinion that Gross had an impairment in adaptive skills. The ALJ stated that Ancell did not opine on whether the impairment was mild, moderate, or more severe and Drs. Taylor and Rozenfeld only found moderate limitations in these areas. The ALJ also noted that Gross reported that she could perform household chores but did not because her mother had a housekeeper. R. 27.[7]

The ALJ gave little weight to the third-party reports from Everlen and Hall because they were not consistent with the other evidence in the file including the medical evidence. The ALJ specifically noted that the medical evidence did not support Everlen and Hall's statement that Gross could only pay attention for five minutes. R. 27-28.

The ALJ determined at Step 4 that Gross did not have any relevant past work. At Step 5, the ALJ determined that Gross could perform a significant number of jobs in the national economy. The ALJ relied on his RFC determination; the Medical Vocational Guidelines, 20 C.F.R. Part 404 Subpart P, Appendix 2; and the opinions of Dr. Lanier. The ALJ found that Gross could perform the jobs of router, routing clerk, mail sorter, addresser,

---

[7] The ALJ erroneously stated that Ancell issued her report in 2008. R. 27. The error was harmless because the ALJ did not rely on the date of the examination in his analysis.

document preparer, and surveillance systems monitor.  R. 30.  The ALJ concluded that Gross was not disabled.

Gross appealed to the Commissioner's Appeal Council.  As part of the appeal, Gross submitted a physical therapy assessment dated February 3, 2018.  R. 8-11.  Gross saw the physical therapist for an ataxic gait and injury to her right hip.  Gross reported that she fell and injured her hip.  She said she had arthritis in the hip since the June 2014 automobile accident.  She said she could not stand more than 10 minutes and could not do household chores.  Gross rated her pain as a 10 out of 10.  On examination, Gross' range of motion of her lower extremities was limited and painful.   Gross' strength in her right leg was 3/5 and testing was painful.  Gross could not walk without a walker.  The physical therapist recommended to her physician to prescribe a walker.  The physical therapist did not recommend additional physical therapy due to the pain. R. 9-11.

On August 13, 2018, the Appeals Council denied Gross' request for review.  The decision of the ALJ became the final decision of the Defendant Commissioner.  R. 1.  Gross then brought this action for judicial review.

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ made two errors.  Each error, alone, might not be sufficient to warrant a remand.  Taken together, however, the cumulative effect is sufficient to require reversal.  The ALJ did not discuss the March 31, 2016 EMG/nerve conduction study.  That study showed that after her May 2015 surgery, Gross still had radiculopathy at the C-6 level, but the radiculopathy at the C-7 level was resolved.  The EMG/nerve conduction study in March 2015 before the May 2015 cervical spinal surgery showed polyneuropathies at C-6 and C-7.  Gross testified that the surgery did not improve her condition.  The March 31, 2016, EMG/nerve conduction study showed that some of the radiculopathy was resolved, but some remained.  The test has bearing on the weight to give Gross' testimony regarding her statements about the effect of the surgery on her symptoms.  The ALJ did not discuss the March 31, 2016 test, and so, the Court cannot determine whether he considered the test in coming to his decision about the weight to give Gross' statements.

The ALJ also erred in not explaining the basis for his boilerplate statement, quoted above on page 37, that Gross' daily activities were not as limited as one would expect from her testimony.  The Seventh Circuit has condemned such boilerplate without adequate explanation of the basis for the statement.  See e.g., Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th

Cir. 2012). A claimant's daily activities is one of the factors to be considered in evaluating the weight to be given to a claimant's statement about the limiting effects of her symptoms and pain. 20 CFR 404.1529(c)(3) and 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *7 (March 28, 2016, revised October 25, 2017). The ALJ mentioned a few daily activities at Step 3 of the Analysis but did not explain how those activities related to his determination of the weight to give Gross' statements about the limiting effects of her symptoms. Without this type of explanation, the Court cannot determine how Gross' daily activities supported the conclusion the ALJ made in the boilerplate statement.

Because the ALJ committed both of these errors, the ALJ failed to minimally articulate all the material evidence. See Herron, 19 F.3d at 333. The case, therefore, must be remanded for further proceedings.

Gross raises a number of other complaints about the ALJ's decision. The Court does not believe they have merit. Most of Gross' other arguments essentially ask the Court to reweigh the evidence. The Court will not do so. See Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82.

In addition, Gross also argues the ALJ erred in relying on the opinions of state agency physicians because the doctors did not consider evidence that developed after the date of the opinions. Gross relies on

Stage v. Colvin, 812 F.3d 1121 (7th Cir. 2016).  In that case, the claimant

complained primarily of symptoms related to arthritis and deterioration in

her back.  The state agency physicians issued their opinions on the

claimant based on this evidence.  Seven months later, the claimant had

severe problems with her hip.  An orthopedic surgeon recommended hip

replacement surgery. The ALJ erred in relying on the state agency

physician opinions because the state agency physicians did not consider

the material new evidence regarding the claimant's hip condition.  Stage,

812 F.3d at 1123.  Here, Gross does not cite to any medical evidence that

showed her condition worsened after Dr. Chapa's examinations or Drs.

Dow and Delphia rendered their opinions.  The March 31, 2016,

EMG/nerve conduction study showed that some radiculopathy remained

after the surgery but did not show that her condition worsened.  The 2017

MRI of her spine showed her condition had not changed from the 2015 MRI

study.  The agency physicians, therefore, relied on evidence that was still

relevant at the time of the evidentiary hearing in 2017.  The Court sees no

error in considering these opinions.

Gross also relies on the 2018 physical therapy report that she claims

showed a new problem related to her hip.  The 2018 report was not in

existence when the ALJ rendered his decision.  This Court can only

consider evidence that was before the ALJ when, as here, the Appeals Council denied the request for review. <u>Wolf v. Shalala</u>, 997 F.2d 321, 323 n.3 (7th Cir. 1993). The 2018 physical therapy report, therefore, is not relevant to evaluating the ALJ's decision.  On remand, however, Gross may present new evidence related to her hip.

Gross also complains that the ALJ did not adequately address Gross' limited intelligence in determining the RFC.  The Court disagrees.  The 2015 examination by Dr. Trello and the opinions of Drs. Taylor and Rozenfeld provided ample support for the non-exertional limitations the ALJ included in the RFC to address Gross' intellectual limitations.  The Ancell IQ test is relevant and the ALJ considered it in light of the other evidence. The Court sees no error in the ALJ's analysis of this evidence.

THEREFORE, IT IS ORDERED Plaintiff Karen Gross' Motion for Summary Judgment (d/e 14) is ALLOWED, The Defendant Commissioner's Motion for Summary Affirmance (d/e 17) is DENIED, and the decision of the Commissioner is REVERSED and REMANDED pursuant to 42 U.S.C. § 405(g) sentence four.  THIS CASE IS CLOSED.

ENTER:   February 19, 2020        ___*s/ Tom Schanzle-Haskins*_____
                                                           TOM SCHANZLE-HASKINS
                                                           UNITED STATES MAGISTRATE JUDGE